IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION


AKEEM MUHAMMAD,

     Plaintiff,

vs.                             Case No. 4:05cv193-WS/WCS

WALTER A. McNEIL,[1]
JAMES McDONOUGH,
JAMES CROSBY,
GEORGE SAPP, and
FRANCHATTA BARBER,


     Defendants.

_____/


## REPORT AND RECOMMENDATION

     This is a civil rights case filed pursuant to 42 U.S.C. § 1983.  It is before the court

on a third amended complaint.  Doc. 63.  Defendants filed a special report that has been

converted to a motion for summary judgment.  Doc. 114.  Plaintiff was given notice of

his responsibilities in responding to a motion for summary judgment, and a date was set

---

     [1] Walter A. McNeil succeeded James McDonough as Secretary for the
Department of Corrections, and is automatically substituted for McDonough in his
official capacity.  FED. R. CIV. P. 25(d).

for taking the motion under advisement.  Doc. 127.  The motion for summary judgment was supplemented.  Docs. 185 and 201 (an amended affidavit).

Plaintiff filed a response and then an amended response.  Docs. 190 and 205. The amended response, doc. 205, replaced the original response.  Plaintiff has also filed identical notices clarifying his claims.  Docs. 199 and 204.

**Allegations of the third amended complaint, doc. 63**

Plaintiff sues three Secretaries of the Department of Corrections, two former Secretaries (Crosby and McDonough), and the current Secretary, McNeil.  He also sues the Assistant Secretary and Deputy Assistant Secretary for Institutions, Sapp and Barber, respectively.

**Halal Diet**

Plaintiff is serving a life sentence.  Doc. 63, p. 7.  He alleges that he is an orthodox Muslim "who sincerely believes that a fundamental tenet of Islam" is that he "consume only a Halal diet and abstain from consuming anything Haraam."[2]  *Id.*  He states that "a Halal diet includes fruit, vegetables, grain, eggs, milk, nuts, beans, rice, pasta and meat from herbivorous animals that are properly slaughtered by a Muslim according to the Islamic ritual known as 'Thabh.' "  *Id.*, pp. 7-8.  Plaintiff alleges that the opposite of Halal food is Haraam food, which includes pork, meat from carnivorous animals, meat from other animals not properly slaughtered, and any food containing a Haraam ingredient or that came into contact with Haraam food.  *Id.*, p. 8.

---

[2] These words are spelled at various times as Halal and Halaal, and Haram or Haraam in the documents in this record.

Plaintiff alleges that Defendant Crosby, former Secretary of the Department of Corrections, and Defendant McDonough, Secretary of the Department of Corrections when the third amended complaint was filed, adopted FLA. ADMIN. CODE R. 33-503, which states that "inmates who wish to observe religious dietary laws shall be provided a diet sufficient to sustain them in good health without violating those dietary laws." *Id.* Plaintiff alleges that those Defendants then adopted "an unwritten policy to deny Muslim inmates a Halal diet." *Id.* Plaintiff alleges that Defendants Sapp and Barber enforce this policy in their duties managing institutions, and as a consequence, Plaintiff is denied a Halal diet. *Id.*

Plaintiff further alleges that Crosby and McDonough adopted Department of Corrections Procedure 503.005, "which guarantees Jewish inmates the right to receive a Jewish Diet," and Sapp and Barber enforce this policy. *Id.*, p. 9.

Plaintiff alleges that as an alternative to a Halal diet, he is allowed to choose between a regular diet, an alternate entree diet, and a vegan diet. *Id.* None of these are Halal diets because the food is contaminated by Haraam food products. *Id.* Consequently, Plaintiff is forced to eat other than a Halal diet and "feels that he is sinning, defiling himself . . . ." *Id.*, p. 10.

**Islamic clothing**

Plaintiff asserts that a fundamental tenet of his faith is that he must wear a Qamees and Sataaweel at all times, especially during Salah (ritual prayer). *Id.* He alleges he also must wear clothing which covers his entire body, including his elbows, but does not hang below his ankles, and which hides the color or figure of his body. *Id.*

Plaintiff explains that Qamees is a long sleeved, long loose shirt that hangs to the knees.  *Id.*  Sataaweel are loose fitting trousers that hang above the ankles.  *Id.*  Plaintiff alleges that the clothing provided to him by Defendants do not meet these standards. Indeed, Qamees and Sataaweel are prohibited by FLA. ADMIN. CODE R. 33-602.201, Appendix 1.  *Id.*, pp. 10-11.

### Tucked-in shirt

Plaintiff alleges that it is a tenet of his religion to never tuck in his shirt.  *Id.*, p. 11. Plaintiff alleges that Defendant McDonough adopted an unwritten policy that prisoners must tuck in their shirts when outside their cells.  *Id.*

### Qibla compass

Plaintiff alleges that it is a tenet of his religion that he perform Salah facing in the direction of Qibla, the Holy Mosque in Mecca, Saudi Arabia.  *Id.*, p. 12.  He asserts he needs a Qibla compass to face in the correct direction, but this is prohibited by FLA. ADMIN. CODE R. 33-602.201, Appendix 1.  *Id.*

### Secluded showers

Plaintiff alleges that it is a tenet of his religion that he shower in seclusion because his religion forbids him to reveal the form, skin, or color of his body between the navel and below the knees.  *Id.*, p. 13.  He alleges that he is required to shower in view of others, and to walk to the shower in his underwear, pursuant to FLA. ADMIN. CODE R. 33-601.800(10)(e).  *Id.*, pp. 13-14.

**Gold crowns**

Plaintiff has sixteen gold crowns in his teeth, put there in his youth, but his religion now forbids this.  *Id.*, p. 15.  He offers to have the crowns removed at his cost but Defendants have refused .  *Id.*, pp. 15-16.

**Basis for the claims**

Plaintiff alleges in his third amended complaint that Defendants have violated his rights under the Religious Land Use and Institutionalized Person's Act (RLUIPA), 42 U.S.C. 2000gg and the free exercise clause of the First Amendment.  *Id.*, pp. 17-20.  He alleges that the fact that a diet is provided to Jewish prisoners but not to him denies him Equal Protection of the law provided by the Fourteenth Amendment.  *Id.*, p. 17.  Plaintiff seeks a declaratory judgment, injunctive relief, and monetary damages.

Plaintiff now has clarified, however, that he brings the Halal diet claim against all Defendants in their official and individual capacities, for declaratory and injunctive relief, nominal and punitive damages, under the RLUIPA, First Amendment, and Equal Protection Clause.  Docs. 199 and 204.  As to the other five claims, Plaintiff seeks nominal and punitive damages, and declaratory and injunctive relief, against all Defendants only in their official capacities and brings those claims only under the RLUIPA "as long as the court deems that Plaintiff has established that Defendants have substantially burdened his exercise of religion" regarding these claims.  *Id.*

**Legal standards governing a motion for summary judgment**

On a motion for summary judgment Defendants initially have the burden to demonstrate an absence of evidence to support the nonmoving party's case.  Celotex Corporation v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 2553-54, 91 L.Ed.2d 265

(1986).  If they do so, the burden shifts to the Plaintiff to come forward with evidentiary

material demonstrating a genuine issue of material fact for trial.  *Id.*  Plaintiff must show

more than the existence of a "metaphysical doubt" regarding the material facts,

Matsushita Electric Industrial Co., LTD. v. Zenith Radio Corporation, 475 U.S. 574, 586,

106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986), and a "scintilla" of evidence is insufficient.

There must be such evidence that a jury could reasonably return a verdict for the party

bearing the burden of proof.  Anderson v. Liberty Lobby, 477 U.S. 242, 251, 106 S.Ct.

2505, 2512, 91 L.Ed.2d 202 (1986).  An issue of fact is "material" if it could affect the

outcome of the case.  Hickson Corp. v. Northern Crossarm Co., Inc., 357 F.3d 1256,

1259 (11th Cir. 2004) (citations omitted).  However, "the evidence and inferences drawn

from the evidence are viewed in the light most favorable to the nonmoving party, and all

reasonable doubts are resolved in his favor."  WSB-TV v. Lee, 842 F.2d 1266, 1270

(11th Cir. 1988); Watkins v. Ford Motor Co., 190 F.3d 1213, 1216 (11th Cir. 1999) ("We

are required to resolve all reasonable inferences and facts in a light most favorable to

the nonmoving party.").

"Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by

her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on

file,' designate 'specific facts showing that there is a genuine issue for trial.' "  Owen v.

Wille, 117 F.3d 1235, 1236 (11th Cir. 1997), *cert. denied* 522 U.S. 1126 (1998), *quoting*

Celotex, 477 U.S. at 324, 106 S. Ct. at 2553 (quoting Fed. R. Civ. P. 56(c), (e)).  The

nonmoving party need not produce evidence in a form that would be admissible as Rule

56(e) permits opposition to a summary judgment motion by any of the kinds of

evidentiary materials listed in Rule 56(c).  Owen v. Wille, 117 F.3d at 1236; Celotex, 477 U.S. at 324, 106 S. Ct. at 2553.

Local Rule 56.1(A) provides that a motion for summary judgment "shall be accompanied by a separate, short and concise statement of the material facts as to which the moving party contends there is no genuine issue to be tried.  Failure to submit such a statement constitutes grounds for denial of the motion."  The Local Rule also provides that the statement "shall reference the appropriate deposition, affidavit, interrogatory, admission, or other source of the relied upon material fact, by page, paragraph, number, or other detail sufficient to permit the court to readily locate and check the source."  The Local Rule provides that the party opposing the motion, in this case the Plaintiff, shall serve a similar statement of material facts as to which the party contends there is a genuine issue to be tried, using the same format.  Finally, the Local Rule provides that the movant's properly filed statement of undisputed facts will be deemed to be admitted unless controverted by the opposing party in the manner specified by the Rule.  *See* Jones v. Gerwens, 874 F.2d 1534, 1537 n.3 (11th Cir. 1989) (determining that plaintiff's failure to controvert defendants' statement of undisputed facts filed in compliance with a similar local rule of the Southern District of Florida constituted an admission that such facts were not disputed for summary judgment purposes.)

Defendants failed to comply with the Local Rule.  Defendants submitted a general "statement of facts."  Doc. 114, pp. 2-4.  In the body of the motion, Defendants discuss additional evidence without any indication whether the *facts* are without dispute. *Id.*, pp. 9-17.  Plaintiff, on the other hand, tried to comply with the Local Rule.  Doc. 205,

pp. 91-101; doc. 205-2, pp. 92-102 on the electronic case filing (ECF) docket (hereafter the second citation will be to the electronic docket).  Given the age of this case, I have reviewed all of the evidence of record without the aid of a statement by the moving party (Defendants) identifying facts as to which there is no dispute.

**The evidence of record**

**Defendants' evidence**

As of July 26, 2006, the Florida Department of Corrections had over 86,000 prisoners, who have registered 111 kinds of religious preferences.  Doc. 114, Ex. A (affidavit of Chaplaincy Services Administrator Alex Taylor), p. 1; doc. 114-2, pp. 1 and 4.  Male Muslim prisoners are permitted to have a religious medallion, a koofi (head covering), a prayer rug, and prayer beads.  *Id*.  Chaplaincy Services maintains a calendar of religious days for the variety of religions practiced by prisoners, and supervises holy day activities.  *Id*.  Requests for religious items or religious ceremonies and practices of all faiths are subjected to security evaluation.  *Id*., p. 2.  Also, there is evidence that:

> [w]hen the observance of a religious holiday involves the consumption of donated food items, the provision of such food by volunteer donors must be coordinated.  The provision of donated food implicates security, health and safety issues such as contraband and spoilage.  An inmate may not simply arrange for food to be shipped to the institution without coordination of official approval.

*Id*., pp. 1-2.

When Defendants' motion for summary judgment was filed, the Department provided three meals as alternatives to the normal menu.  The first was an alternate entree meal plan, with no pork or pork by-products.  *Id*.  The second was a vegan meal

plan, with no dairy or other animal products.  *Id.*  The third was a Jewish dietary plan.
*Id.*

The Jewish diet was discontinued by directive of Secretary McDonough on
August 16, 2007.  Doc. 185, Ex. S; doc. 185-3 on ECF, p. 5.  On the same date, all pork
and pork products were eliminated from all of the food service plans in the Florida
Department of Corrections.  *Id.*  The vegan and no-meat alternative entree meal plans
were continued.  *Id.*  Presumably this means a no pork alternative entree meal, but that
is unclear.

Defendants filed the affidavit of Abdulrahim Al-Khatib, who is a Muslim Imam
employed by the Department as supervising chaplain at Polk Correctional Institution.
Doc. 114, Ex. E; doc. 114-2, pp. 31-33 on ECF.  Imam Al-Khatib provided his affidavit to
"provide some general information on various practices and traditions of the Islamic
religion."  *Id.*, p. 31.  Imam Al-Khatib states that there are five "rites or acts of worship
commonly referred to as the five pillars of Islam."  *Id.*  These are, the shadah, or
profession of faith, which involves reciting that there is no god but Allah and Muhammad
is the prophet of Allah; the salat, or daily ritual of prayer normally consisting of prayer
facing the shrine of the Ka'bah in Mecca at five times during the day, but with the noon
prayer on Friday held as a congregational prayer (salat al-jum'ah); the zakat, a religious
tax to help the poor; sawm, religious fasting during Ramadan; and hadg, the pilgrimage
to Mecca once in a lifetime.  *Id.*, pp. 31-32.

Addressing Plaintiff's claims, Imam Al-Khatib states that Hala means anything
that is permissible under Islam.  *Id.*, p. 32.

> If the food is meat, the animal must be slaughtered according to traditional guidelines set forth by the Prophet Muhammed.  Muslims are prohibited from eating pork.  There is no requirement in Islam that meat be consumed.  Muslim are permitted to eat forbidden products if forced to do so to avoid starvation.  The Florida Department of Corrections currently offers an alternate entree meal plan that provides sufficient substance for a Muslim inmate to eat and contains no pork or pork by products.  In that the alternate entree meal plan does not contain meat, the Muslim inmate will be abstaining from eating forbidden meat and will still be receiving the government's recommend daily allowances (RDSs).

*Id.*, p. 32.

Imam Al-Khatib states that "[t]here is no mandatory requirement that Muslims wear qamees and saraaweel at all times.  There is nothing sinful about a Muslim man wearing his shirt tucked in."  *Id.*, p. 32.

Imam Al-Khatib states that showering in private is "a point of modesty."  *Id.*, p. 33.  While desirable,

> given the circumstances of security concerns in prisons, it is impossible for a Muslim inmate to not be observed occasionally during the shower.  The fact that [a] Muslim may be seen by [another] man, does not make it sinful due to the fact that [the] main issue is the intent to do right.

*Id.*

Imam Al-Khatib avers that a qibla compass is not needed.  *Id.*, p. 33.  "An inmate can request from staff or the chaplain of the institution, the location of east, which is the direction of Mecca."  *Id.*

Imam Al-Khatib concludes:

> Matters regarding the Muslim faith are governed by the intent to do right.  A belief of the Muslim faith is that the persons intends to do right in whatever situation he or she may be in.  Muslims in non-Muslim countries may have difficulty in keeping with the dietary laws and tenets of the Muslim faith.  It is difficult to avoid forbidden foods.  Regarding Muslim inmates, it is difficult to abide by every tenet of the faith due to their incarceration and balanced against security and safety concerns of the

prison.  To accommodate Muslim inmates, the Florida Department of
Corrections allows Muslim inmates to have a Kufi, prayer beads, and a
prayer rug.  The Muslim inmates are allowed to participate in holy days of
Ramadan, Eid ul Fitr, Eid ul Adha.

*Id.*

Norman A. Thigpen, Food Services Administrator for the Department of
Corrections, provided his affidavit.  Doc. 114, Ex. F; doc. 114-2, p. 34.  Thigpen states
that Plaintiff receives the "alternate entree meal plan," which is a non-pork meal.  *Id.*
Thigpen states that food services are contracted to private companies who charge
money for the food provided.  *Id.*

James Upchurch, the Chief of the Bureau of Security Operations, states in his
affidavit that the Department has "a uniform clothing system in place for all inmates."
Doc. 114, Ex. G; doc. 114-2, p. 36.  The uniform consists of a close but not tight fitting
shirts and pants that conform to the shape of the body.  *Id.*  He states that the uniform
"is necessary to assist the officers in ensuring that the inmates are not attempting to
conceal weapons, contraband, or other unauthorized materials."  *Id.*, p. 37.  The
clothing sought by Plaintiff, a qamees and a saraaweel, are loose fitting and would allow
Plaintiff to conceal a weapon, unauthorized property, or contraband.  *Id.*  If Plaintiff were
allowed to wear such clothing, states Upchurch, "officers would have to conduct more
frequent pat down searches for weapons and contraband, which would be time
consuming and take away from other duties that the correctional officers have to
perform."  *Id.*  This would increase the frequency of interruption of normal inmate
movement and risk confrontation, and still might not detect weapons or contraband.  *Id.*
Additionally, "[p]referential treatment such as allowing inmates to wear clothing other

than the standard uniform will likely cause[] discord in the inmate population and creates

a hostile environment for staff and other inmates."  *Id.*  "Inmates expect to be treated

equally, strongly resent what they consider to be favoritism and react aggressively

regardless of the legitimacy and justification for the exception provided."  *Id.*

Upchurch says that prisoners must tuck in their shirts "to outline the body shape

which enables security staff to be able to better detect the outline of objects that an

inmate may try to stash or smuggle under the belt line."  *Id.*  If prisoners were allowed to

leave shirts untucked, body searches would have to be more frequent.  *Id.*

Upchurch states that Plaintiff is a close management prisoner, and personal

property is limited.  *Id.*, pp. 37-38.  "To add another item to the approved property list in

this high security status is to further delay and diminish our efforts to insure safety and

security in these areas."  *Id.*, p. 38.

Upchurch states that prisoners in close management must shower three times a

week and must be strip searched before a shower.  *Id.*, p. 38.  Prisoners leave their

cells wearing boxer shorts and may also cover themselves with their towel.  *Id.*

Prisoners are "monitored" as they shower for safety and security purposes, and to make

sure that the inmate "is showering and not engaging in any unauthorized activity."  *Id.*

Upchurch concludes:

> Based on the department's experience, regulations requiring uniformity in
> clothing, grooming, personal property, and hygiene requirements, are an
> integral, essential part of maintaining the degree of internal regimentation
> and control necessary to insure safety and security in our prisons and to
> insure that they are operated effectively and efficiently.  Individual choice
> in these areas, if afforded to inmates, is often abused and subsequently
> manifests itself in generalized resistance at various levels to compliance
> with other elements of the institutional environment which together allow

us to effectively manage a large population of unwilling inhabitants in a
confined space and close quarters. . . .

*Id.*, p. 38.

Thomas E. Shields, II, D.D.S., states in his affidavit that he is a licensed dentist

working for the Department of Corrections.  Doc. 114, Ex. H; doc. 114-2, p. 40.  On July

11, 2006, Dr. Shields contacted the dentist at Florida State Prison, where Plaintiff is

housed, to schedule an appointment to review what would be needed to remove his

gold crowns.  *Id.*  He was told that Plaintiff refused to have a dental examination.  *Id.*

Dr. Shields cannot determine the "medical" necessity of removing the gold without an

examination.  *Id.*  Removal of the gold may be costly depending upon the type of crown

and the status of the teeth.  *Id.*, pp. 40-41.

James Poston, D.D.S., provided an affidavit in which he states that he is a

licensed dentist employed by the Department of Corrections at Florida State Prison.

Doc. 114, Ex. I, doc. 114-2, p. 44.  He states that Plaintiff refused to come to a dental

"call-out" and therefore Dr. Poston was unable to "assess if there was a medical need

for the removal of the crowns."  *Id.*

**Plaintiff's evidence**

Ahmed Sadek Ahmed is qualified to speak on matters relating to Islamic law as a

"qualified and competent theologian."  Doc. 205, Ex. A, p. 1 and "Annexure" A.[3]  Ahmed

states in his affidavit that he is a Sunni Muslim.  *Id.*, p. 2.  Sunni Muslims constitute

about 95% of all Muslims, while Shiahs constitute about 5%.  *Id.*  Among Sunnis, there

are four "schools of thought," and Ahmed belongs to the dominant school, Hanafi Math-

___

[3] These exhibits were also attached to the initial response, doc. 190, and several
were filed earlier as noted by Plaintiff.  Doc. 205, Index, p. 2; doc. 205-3, p. 105.

hab, an orthodox sect that strictly follows Islamic law.  *Id.*  Plaintiff follows the Hanafi

Math-hab.  *Id.*, p. 7.  Ahmed states that there are modernist "deviate scholars," who are

considered evil, who do not fully subscribe to the life pattern of the Holy Prophet, and it

is not permissible for an Orthodox Muslim to follow such a deviate.  *Id.*  Ahmed explains

that "[v]iolations of Islamic Law are sinful and prohibited."  *Id.*, p. 3.

Ahmed avers that the following are fundamental tenets of Islam as practiced by

the dominate, orthodox group:  for males, wearing a beard; wearing Islamic dress

(consisting of Qamees (below knee, long shirt) and trousers above the ankles); keeping

concealed the Aurah, which is that part of the male body from the navel to just over the

knees; not wearing gold; and consuming only Halaal food  *Id.*, pp. 3-8.  Ahmed states:

"Although it is not mandatory to have a compass, it is permissible and a useful item for a

Muslim Inmate."  *Id.*, p. 8.  In a supplemental affidavit, Ahmed avers that "reliance on

the word of a non-Muslim [for determining the proper direction for prayer] is not

permissible."  Doc. 205, Ex. F.

Ahmed states that:

> The emphasis on consumption of *halaal* and wholesome food is of an
> exceptionally high degree in Islam.  A Muslim may consume non-halaal
> food only if he is on the verge of death due to starvation and he is unable
> to find any *halaal* food.  In such dire straits he may consume only sufficient
> non-halaal food to save his life.

*Id.*, Ex. A, p. 6.  Ahmed explains that meat that has not been slaughtered in accordance

with Islamic procedure, and which has not been "under continuous Muslim supervision

from the point of slaughter to the time the Muslim consumer takes possession of the

meat" is considered haraam, which is unlawful and prohibited.  *Id.*, pp. 5-6.  Meat that is

delivered by a non-Muslim is prohibited.  *Id.*, p. 6.  Pork, carnivorous animals, and all sea animals except fish, are prohibited.  *Id.*

Alcohol and any food or drink containing alcohol are prohibited.  *Id.*

Ahmed avers that "Muslims are not permitted to consume even non-meat food prepared in a kitchen where *haraam* food is also prepared."  *Id.*, p. 7.  "There should be complete separation of utensils, cutlery, etc."  *Id.*  If a separate kitchen cannot be provided, Plaintiff "should be served uncooked non-meat foods such as peanut butter, bread, cheese, tuna and other tinned fish, etc."  *Id.*

On October 30, 2004, Mujlisul Ulama "prohibited Inmate Akeem Muhammad with a verdict of prohibition regarding his gold crowned teeth."  *Id.*, p. 4.  The Fatwa ordering Plaintiff to have his gold crowns removed is Exhibit Z to document 205.  Ahmed explains that there "is no such thing as 'Islamic' medallion.  Muslim males are not permitted to wear any item of jewel[]ery, medallions and the like."  *Id.*, p. 9.

Ahmed avers that "[p]ermission to have a prayer rug, dhikr beads, 'Islamic medallion', invalid Jumuah and Eid services, etc. do not fulfil the religious needs of Inmate Muhammad.  All these factors have no bearing on the actual mandatory requirements of the Islamic Faith."  *Id.*, p. 9.  Ahmed then specifically addresses and refutes many of the opinions of Imam Al-Khatib.  *Id.*, p. 7-8.  Ahmed states:

> I endorse the correctness of the Islamic facts and attitudes set out by Inmate Muhammad in his 4th Amended Complaint.[4]  The alleged persecution and torture perpetrated by prison officials are absolutely appalling, horrendous and constitute a gross violation of human rights and dignity, as well as violation of the Constitution of the land.  The alleg[]ations are of such a grave nature that the Court is respectfully urged

---

[4] Only the third amended complaint is before the court.

to order the institution of a commission of inquiry into this alleged brutality committed by the officials of said prison.

*Id.*, pp. 8-9.

Plaintiff states in his own affidavit that he has been a Muslim since June 15, 1993.  Doc. 205, Ex. D, p. 2.  He has been housed in death row, close management levels I, II, and III, disciplinary confinement, administrative confinement, and general population.  *Id.*  Like Ahmed, Plaintiff explains that Islam as practiced by the Nation of Islam and modernist Muslims is considered heretical by "mainstream and traditional Islam."  *Id.*, p. 4.  He states that the Department of Corrections only follows the advice of modernist Muslims.  *Id.*, pp. 4-5.  He states that by relying upon the advice of Imam Al-Khatib, the Department of Corrections "imposes divergent religious beliefs."  *Id.*, p. 32.  Plaintiff states that he is a "practicing Orthodox Sunni Muslim who sincerely believes that [he is] compulsory required [sic] to follow the tenets of Islam."  *Id.*, p. 6.

Plaintiff avers that he has been disciplined about 46 times for trying to follow the fundamental tenets of his religion, by refusing to shave and shower in public stalls.  *Id.*  "Because I will not abandon my Islamic beliefs and practices, I will have to remain in [close management level I] for the remainder of my life sentence."  *Id.*

Plaintiff avers that he sincerely believes that he must comply with Islamic dietary laws.  *Id.*, p. 7.  Since 1998, he has been "on alternate entree or vegan diet."  *Id.*, p. 8.  He asked prison officials for the ingredients of the milk and bread products served, and they did not know.  *Id.*  At one time he discovered the manufacturer, wrote to the bread company, and found that the bread probably contained animal products.  *Id.*, p. 9.  Gravy is poured over his alternate entree meal, despite his requests that it not be

provided.  *Id.*  The cheese he is given contains animal enzymes.  *Id.*  The jelly provided

had animal gelatin.  *Id.*, p. 10.  "Dairy Blend" used in recipes contains vitamins A and D,

derived from animals.  *Id.*  The vegan diet includes rice with vitamin D added.  *Id.*, p. 11.

Instant potatoes has milk with vitamin additives.  *Id.*  All of the meals are prepared in the

same kitchen using the same utensils as used for other food.  *Id.*  Plaintiff states that he

has frequently found tiny pieces of meat, large portions of meat, meat grease, and gravy

in his food or on his food tray.  *Id.*, pp. 11-12.  Sliced oranges and bread were delivered

by people who had handled meat, and Jell-O (animal gelatin) is served that has

contaminated other food on the tray.  *Id.*, p. 13.  Plaintiff states:  "Grieving these issues

is useless."  *Id.*, p. 12.

Plaintiff asserts that since 1999 he has suffered from colitis and irritable bowel

syndrome.  *Id.*, p. 15.  He states that he cannot tolerate fruit, vegetables, and beans

because these exacerbate his illness.  *Id.*  Thus, he cannot tolerate the vegan diet and

must eat the alternate entree.  *Id.*, p. 16.  He also cannot eat the vegan diet because, to

stay healthy, one must eat more of such food and overeating is an Islamic sin.  *Id.*

Plaintiff also avers that:

> The master menu manual describes the alternate entree bag lunch meal
> as consisting of two peanut butter and jelly sandwiches, one cheese
> sandwich, one fruit and a dessert.  I asked prison officials and the
> Defendants to provide me with an alternate entree bag lunch meal for
> every meal as part of Islamic dietary accommodations, however, they
> denied my requests.

*Id.*, p. 29.

Plaintiff avers that he sincerely believes he must wear only a Kufi, Qamees, and

Saraaweel.  *Id.*, p. 16.  The clothing issued by the Department of Corrections is not

proper, according to his faith.  *Id.*, p. 17.  Plaintiff states he especially would like to wear Islamic clothing in his cell only during prayers.  *Id.*, p. 18.

Plaintiff also states that he sincerely believes it is a sin to tuck in his shirt.  *Id.*, p. 18.  He avers that by policy, prisoners are allowed to have their shirts outside their pants inside housing units and outside their cells, inside the gym, and in the recreation yard during non-business hours.  *Id.*, p. 19.  He states he is required to tuck in his shirt, like all other inmates, for formal occasions.  *Id.*, pp. 18-19.

Plaintiff states that he believes he must face Mecca when praying, and the direction to Mecca is not simply east.  *Id.*, p. 20.  It varies according to where one is.  *Id.*  He cannot exit his cell in confinement to determine the proper direction.  *Id.*  A ten dollar Qibla compass would help him determine the proper direction for prayer.  *Id.*

Plaintiff states that it is his sincerely held belief that he must not expose the form, skin, or color of his body from his navel to just below the knees.  *Id.*, p. 21.  When in close management at either Florida State Prison or Union Correctional Institution, some correctional officers permit a prisoner to shower in his cell, but others do not and issue a disciplinary report if a prisoner showers in his cell.  *Id.*, p. 21.  At Charlotte Correctional Institution, all prisoners must shower in shower stalls.  *Id.*  The towels provided by the prisons do not adequately cover Plaintiff's body from his navel to below his knees.  *Id.*, p. 22.  Close management shower stalls are in direct view of other people so that a prisoner cannot shower in private, and a prisoner is in view of even female staff.  *Id.*, p. 23.  Close management cells "are [equipped] with water facilities that enable inmates to shower in their cells."  *Id.*, p. 22.  Plaintiff does not further describe these "water facilities."  Plaintiff asserts that when he refused to shower in a shower stall, he was

sprayed with chemical agents.  *Id.*, p. 23.  Plaintiff states that since March 2, 2006, he has been at Florida State Prison in close management and has not been required to shower in a shower stall "and no problems have resulted therefrom."  *Id.*, pp. 24-25.

Plaintiff states that he believes it is a sin to continue to have gold crowns on his teeth.  *Id.*, p. 25.  He offers to have them removed at his own cost but has been denied. *Id.*  Plaintiff says that his family and friends will pay for the removal of the gold crowns (and presumably for the installation of 16 new crowns).  *Id.*, p. 26.  Plaintiff explains that on July 12, 2006, he did not knowingly refuse to go to the dentist with respect to his gold crowns.  *Id.*  He said he signed the refusal to go because he thought that this was for a routine dental checkup and he was having no problems with his teeth.  *Id.*  He said that when he told Sergeant Randall and the nurse that he misunderstood, and that he did want to have his gold crowns examined, they both walked off and would not permit him to attend his dental appointment.  *Id.*, pp. 26-27.  Plaintiff states that the dentist at Florida State Prison, Dr. Rose, told him on March 1, 2007, that "it would be no problem for him to remove my gold crowns and that all he needed was the authorization from central office."  *Id.*, p. 27.

Exhibit J to document 205 sets forth lists of halal (permitted) and haram (not permitted) foods.  It is produced by the City of Toronto, Canada, public health office.  *Id.* Among the food ingredients that the publication states are forbidden for those of the Islamic faith are alcohol (used in deserts, packaged foods), animal shortening, broth (used in soups), gelatin, ham, bacon, lard, L-cysteine (used in dough and flour), lipase (used in cheese), mono and diglycerides (used in breads, processed foods), pepsin and rennet (used in cheese, yoghurt), sodium stearoyl-lactylate (used in bread), vanilla

extract (used in baked goods, desserts), and whey (used in cheese, crackers, and combination foods).  *Id.*, p. 4.

Plaintiff has also provided affidavits from inmates Amon Richards, Troy Thomas, Abdul Whid Al-Muqsit (two affidavits), Charles Wright, and Lacey Simmons.  Doc. 205, Ex. M-2 through Q and Y.  These prisoners generally set forth averments supportive of the matters described by Plaintiff in his own affidavit.   The specifics are not set forth here because the evidence is cumulative.

Included among Plaintiff's exhibits is Department of Corrections Procedure Number 503.005.  *Id.*, Ex. R.  The purpose is to establish accommodations for a Jewish diet.  *Id.*  As noted earlier, these procedures no longer are in effect and the Department no longer provides a Jewish diet.

### Genuine disputes of material fact

With the exception of their views about the sinfulness of pork, Imam Al-Khatib and theologian Ahmed disagree as to every aspect of the tenets of Islam relevant to Plaintiff's claims.  Therefore, the Court must assume that the opinions expressed by theologian Ahmed correctly describe Plaintiff's religious faith.

## Legal analysis

### Claims under the Religious Land Use and Institutionalized Person's Act (RLUIPA)

#### Scope of the RLUIPA claims

To repeat, Plaintiff has clarified that he brings the Halal diet claim against all Defendants in both official and individual capacities seeking equitable and monetary relief, and he premises this claim not only upon the RLUIPA, but also the First

Amendment and Equal Protection.  He brings all of the other claims only under the RLUIPA and only against the Defendants in their official capacities for equitable and monetary relief.

Plaintiff's claims for declaratory and injunctive relief are properly lodged against Defendants McNeil, Sapp, and Barber in their official capacities since those persons currently hold office and have authority to respond to such relief.  The claims are moot as to Crosby and McDonough, who no longer hold the position of Secretary of the Department of Corrections.

The RLUIPA does not permit a monetary claim against a defendant in his or her individual capacity.  Smith v. Allen, 502 F.3d 1255, 1275 (11th Cir. 2007).  Plaintiff's monetary claims against Defendants in their individual capacities for monetary damages should be dismissed.

The Eleventh Amendment is not a bar to nominal damages against a defendant in his official capacity under the RLUIPA.  502 F.3d at 1276 n.12.  However, since Plaintiff is a prisoner, Plaintiff can only bring claims for nominal monetary damages against Defendants in their official capacities, and cannot bring any claims for punitive damages absent evidence of physical injury.  502 F.3d at 1271, relying on 42 U.S.C. § 1997(e).  Plaintiff has presented some evidence of physical injury relating to the Halal diet.  He has presented evidence that the alternative diets provided to him have made him sick due to colitis and irritable bowel syndrome.  Assuming the truth of Plaintiff's evidence, he has presented evidence that the failure to give him cooked Halal meals has caused significant gastric distress.  Plaintiff may continue to litigate his RLUIPA Halal diet claim for nominal and punitive damages against Defendants in their official

capacities.[5]  But a final refinement is needed.  Official capacity claims run only to the official who represents the State of Florida since the award of damages against an official in his official capacity is directly against the State of Florida.  The only official needed to respond to such claims, even though related to the official actions of others, is current Secretary McNeil.  Current Secretary McNeil also is the only proper Defendant, as will be explained ahead, because this suit is about official policies, and Defendants Sapp and Barber do not make those policies.

Plaintiff has not presented any evidence of physical injury as to any other of the RLUIPA claims.  Thus, Plaintiff may not seek any damages for any RLUIPA claim against Defendant McNeil in his official capacity except for the Halal diet claim.

## Legal standards governing a RLUIPA claim

^As explained in Smith v. Allen, the RLUIPA:

> states that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability," unless the government can demonstrate that the burden "is in furtherance of a compelling governmental interest" and "is the least restrictive means of furthering that compelling governmental interest."  42 U.S.C. § 2000cc-1(a).  Section 3 of RLUIPA thereby affords to prison inmates a "heightened protection from government-imposed burdens," by requiring that the government demonstrate that the substantial burden on the prisoner's religious exercise is justified by a compelling, rather than merely a legitimate, governmental interest.  *See Warsoldier v. Woodford*, 418 F.3d 989, 994 (9th Cir. 2005) (citation omitted).  In doing so, section 3 affords confined persons "greater protection of religious exercise than what the Constitution itself affords."  *Lovelace v. Lee*, 472 F.3d 174, 186 (4th Cir. 2006).  Section 3 applies whenever "the substantial burden on religious exercise is imposed in a program or activity that receives federal financial assistance."  42 U.S.C. § 2000cc-1(b)(1).

---

[5] As will be explained ahead, this particular RLUIPA damage claim is the only one that should survive.

502 F.3d at 1266.  Thus,

> [t]o establish a *prima facie* case under section 3 of RLUIPA, a plaintiff
> must demonstrate 1) that he engaged in a religious exercise; and 2) that
> the religious exercise was substantially burdened.  *See Adkins*,[6] 393 F.3d
> at 567; 42 U.S.C. § 2000cc-1(a).  The plaintiff "bear[s] the burden of
> persuasion on whether the . . . government practice that is challenged by
> the claim substantially burdens the exercise of religion."  42 U.S.C. §
> 2000cc-2(b).  If the plaintiff succeeds in demonstrating a *prima facie* case,
> the government must then demonstrate that the challenged government
> action is [sic] "is in furtherance of a compelling governmental interest" and
> "is the least restrictive means of furthering that compelling governmental
> interest."  42 U.S.C. §§ 2000cc-1(a), 2000cc-2(b).  In contrast, if the
> plaintiff fails to present evidence to support a *prima facie* case under
> RLUIPA, the court need not inquire into whether the governmental interest
> at stake was compelling.  *See Midrash Sephardi, Inc. v. Town of Surfside*,
> 366 F.3d 1214, 1228 (11th Cir. 2004).

502 F.3d at 1276.

However, that a compelling state interest is required by the RLUIPA does not

mean that courts should no longer give substantial deference to the decisions of prison

administrators.  In Cutter v. Wilkinson, 544 U.S. 709, 125 S.Ct. 2113, 161 L.Ed.2d 1020

( 2005), the Supreme Court said:

> We do not read RLUIPA to elevate accommodation of religious
> observances over an institution's need to maintain order and safety.  Our
> decisions indicate that an accommodation must be measured so that it
> does not override other significant interests.  In *Caldor*,[7] the Court struck
> down a Connecticut law that "arm[ed] Sabbath observers with an absolute
> and unqualified right not to work on whatever day they designate[d] as
> their Sabbath."  472 U.S., at 709, 105 S.Ct. 2914.  We held the law invalid
> under the Establishment Clause because it "unyielding[ly] weigh[ted]" the
> interests of Sabbatarians "over all other interests."  *Id.*, at 710, 105 S.Ct.
> 2914.

---

[6] Adkins v. Kaspar, 393 F.3d 559, 566 (5th Cir. 2004).

[7] Estate of Thornton v. Caldor, Inc., 472 U.S. 703, 105 S.Ct. 2914, 86 L.Ed.2d
557 (1985).

> We have no cause to believe that RLUIPA would not be applied in an
> appropriately balanced way, with particular sensitivity to security concerns.
> While the Act adopts a "compelling governmental interest" standard, *see
> supra*, at 2118, "[c]ontext matters" in the application of that standard. *See
> Grutter v. Bollinger*, 539 U.S. 306, 327, 123 S.Ct. 2325, 156 L.Ed.2d 304
> (2003). Lawmakers supporting RLUIPA were mindful of the urgency of
> discipline, order, safety, and security in penal institutions. *See, e.g.*, 139
> CONG. REC. 26190 (1993) (remarks of Sen. Hatch). They anticipated that
> courts would apply the Act's standard with "due deference to the
> experience and expertise of prison and jail administrators in establishing
> necessary regulations and procedures to maintain good order, security
> and discipline, consistent with consideration of costs and limited
> resources." Joint Statement S7775 (quoting S.Rep. No. 103-111, at 10,
> U.S.CODE CONG. & ADMIN.NEWS 1993, pp. 1892, 1899, 1900).

544 U.S. at 722-723, 125 S.Ct. at 2122-2123 (footnotes omitted).

"[T]o constitute a substantial burden under RLUIPA, the governmental action

must significantly hamper one's religious practice." 502 F.3d at 1277. That question

turns, in part, upon the degree to which the particular practice has been shown by the

plaintiff to be fundamental to the exercise of the particular religion such that the denial of

it would cause "more than an inconvenience on [his] religious exercise." 502 F.3d at

1278 (quoting Midrash, 366 F.3d at 1227). Stated another way,

> a "substantial burden" must place more than an inconvenience on
> religious exercise; a "substantial burden" is akin to significant pressure
> which directly coerces the religious adherent to conform his or her
> behavior accordingly. Thus, a substantial burden can result from pressure
> that tends to force adherents *to forego religious precepts* or from pressure
> that mandates religious conduct.

Midrash Sephardi, Inc. v. Town of Surfside, 366 F.3d 1214, 1227 (11th Cir. 2004)

(emphasis added), *cert. denied*, 543 U.S. 1146 (2005). The existence of alternative

means of religious expression is relevant to whether a substantial burden has been

shown. *Id.*, citing Cheffer v. Reno, 55 F.3d 1517, 1522 (11th Cir.1995). A plaintiff's

failure to show a substantial burden results in a failure to prove a *prima facie* case.

Smith v. Allen, 502 F.3d at 1279.

In Baranowski v. Hart, 486 F.3d 112 (5th Cir.), *cert. denied*, 128 S.Ct. 707

(2007), the court had before it similar claims, a First Amendment free exercise claim,

and Equal Protection claim, and a RLUIPA claim concerning a Jewish kosher diet for a

Texas prisoner.  Applying the RLUIPA, the court found that a Jewish kosher diet was a

valid exercise of the prisoner's religious belief and that failure to provide the diet

substantially burdened his free exercise of that belief.  486 F.3d at 124-125.

The court held, however, that the RLUIPA was not violated because the "dietary

policy of not providing kosher meals is the least restrictive means of furthering a

compelling governmental interest."  *Id.*, at 125.  The court quoted from an affidavit

submitted by the Director of the Texas Chaplaincy Department, which stated:

> TDCJ has determined that it would be far too costly and would far exceed
> the allotted budget to provide kosher food.  No TDCJ unit is currently set
> up to accommodate a kosher diet, which requires food preparation under
> certain ritual requirements and without contact with non-kosher food.
> Given the small number of offenders identifying themselves as Jewish
> (and the small number recognized as practicing Jews by TDCJ Jewish
> authorities), and their various classification and programmatic needs, at
> least several units would have to remodel their kitchens and substantially
> alter food preparation procedures.  Kosher meals also are very costly.
> *The state of Florida has reported that it costs them between 12 and 15
> dollars per day per offender to provide kosher meals* compared with $2.46
> per day the State of Texas pays for offender meals.  Providing kosher
> meals for a very small subset of offenders would place a tremendous
> burden on the ability of TDCJ to provide a nutritionally appropriate meal to
> all other offenders because of the budgetary impact alone.  Furthermore,
> due to budget deficits, the Texas Legislature at the last legislative session
> specifically targeted inmate food services for a mandatory reduction in the
> biennial of more than $6 million.  Providing kosher meals would put a
> great strain on an already strained system, and would raise resentment
> among other inmates because payments for kosher meals would of
> necessity come out of the general food budget for all inmates. The

problem would be compounded because inmates of other faiths would
seek similar privileges.

*Id.*, at 117 (emphasis added).  The court reasoned:

> The uncontroverted summary judgment evidence submitted by
> Defendants establishes that TDCJ's budget is not adequate to cover the
> increased expense of either providing a separate kosher kitchen or
> bringing in kosher food from the outside; that TDCJ's ability to provide a
> nutritionally appropriate meal to other offenders would be jeopardized
> (since the payments for kosher meals would come out of the general food
> budget for all inmates); that such a policy would breed resentment among
> other inmates; and that there would be an increased demand by other
> religious groups for similar diets.

*Id.*  The court affirmed the trial court's grant of summary judgment to Defendants as to

this RLUIPA claim.

### Halal Diet

There is no genuine dispute of material fact as to whether a Halal diet is a

sincerely held tenet of Plaintiff's faith.  There is a genuine dispute of fact as to whether

Plaintiff's religious belief and practice has been substantially burdened, and, as

explained above, the evidence provided by theologian Ahmed and Plaintiff on this point

is assumed to be true.  This evidence shows that the free exercise of this tenet of

Plaintiff's faith has been substantially burdened.

Potential problems are perceived in Plaintiff's dietary claims.  Plaintiff asserts that

he could comply with his religious beliefs if he was given a bag lunch at every meal,

consisting of peanut butter and cheese sandwiches, fruit, and a dessert.  But Plaintiff's

evidence also shows that commercially available breads, cheeses, and desserts often

contain food additives that violate his religious beliefs.  He also avers that he cannot

tolerate fruit due to colitis and irritable bowel syndrome.  Finally, such a meal would

undoubtedly be handled and delivered by non-Muslims.

Still, Defendants have failed to come forward with evidence that they have a

compelling interest in not providing a Halal diet to Plaintiff.  The only evidence is that

food services are contracted out and cost money.  There is evidence that Defendants

were able to provide a Jewish kosher diet to orthodox Jewish prisoners for a few years.

There is no evidence as to the experience that Defendants had in providing that diet

and the reasons for discontinuing the Jewish diet are unknown.  Summary judgment

should be denied as to the Halal claim under the RLUIPA.

### Islamic clothing and shirts not tucked into the pants

There is no genuine dispute of material fact as to whether the Islamic clothing

claim, and the desire not to tuck in a shirt, are a sincerely held tenets of Plaintiff's faith.

There is a genuine dispute of fact as to whether Plaintiff's religious belief and practice

has been substantially burdened, and, as explained above, the evidence provided by

theologian Ahmed and Plaintiff on this point is assumed to be true.

Plaintiff's religion imposes upon Plaintiff obedience to many religious laws

governing his every day behavior.  Were he free to live within any one of these United

States, unlike some countries in this world, he would have full freedom to abide by the

laws of his highly regulated religion.  Plaintiff lives in another highly regulated world,

regulated by the laws of the State of Florida.  Plaintiff put himself there by committing

offenses for which he was sentenced to life imprisonment.  Florida State Prison, and

any other prison to which Plaintiff may eventually be assigned, houses large numbers of

people who, by prior behavior, have shown a significant inability to comply with basic

laws.  Many of these people, especially at Florida State Prison,[8] have committed violent

offenses.  Defendants have a compelling interest in keeping Plaintiff and other prisoners

safe.  Loose clothing can hide a weapon or other contraband.  Having to repeatedly pat

down or strip search Plaintiff imposes a time consuming inefficiency upon correctional

staff.  Further, allowing Plaintiff to wear clothing different from other prisoners will cause

unrest and anger among other prisoners, who are not allowed to express themselves by

the kind of clothing they wear.  Unrest and anger are to be avoided in a prison at all

times.  Defendants have also shown a compelling interest to require all prisoners to

wear a close fitting uniform with the shirt tucked in.  That prisoners sometimes are

allowed to leave their shirts out does not change the compelling state interest.

Summary judgment should be entered in favor of Defendants as to all Plaintiff's RLUIPA

clothing claims.

### Qibla compass

There is no genuine dispute of material fact as to whether praying while facing

Mecca is a sincerely held tenet of Plaintiff's faith.  There is a genuine dispute of fact as

to whether Plaintiff's religious belief and practice has been substantially burdened.  The

evidence provided by theologian Ahmed and Plaintiff on this point is assumed to be

true.  It is accepted, as theologian Ahmed has stated, that Plaintiff cannot rely upon a

non-Muslim to obtain directions toward Mecca.

---

[8] It is judicially noted through the Department's website that Florida State Prison
houses both maximum and close custody prisoners, as well as some medium,
minimum, and community prisoners, and has a total capacity of 1,460 prisoners.  See
http://www.dc.state.fl.us/facilities/region2/205.html

Defendants have shown a compelling interest in not allowing Plaintiff to possess a Qibla compass.  Possession of property is quite restricted, especially for a prisoner like Plaintiff, on close management.  While it would seem that a compass is such an innocent item that Plaintiff should be allowed to possess one, Defendants have a compelling interest in keeping the property lists simple, so that correctional officers can know what to enforce, and to avoid envy among prisoners.  Summary judgment on this RLUIPA claim should be granted to Defendants.[9]

### Showers outside the cell

Plaintiff has shown that this is a sincerely held tenet of his faith, that the region from his navel to below his knees not be exposed to any other person.  He has also shown that his compliance with this tenet of his religion has, from time to time, been substantially burdened.

While not directly on point, in Fortner v. Thomas, 983 F.2d 1024, 1026 (11th Cir. 1993), the court held that "a prisoner retains a constitutional right to bodily privacy." Male inmates at the Georgia State Prison alleged that "several correctional officials, violated their constitutional rights of privacy and due process."  983 F.2d at 1026.  The inmates sought injunctive relief to prohibit "female correctional officers from assignments that allow the officers to view the [inmates] nude in their living quarters, including their use of the showers and the toilet."  *Id.*  The court was persuaded to join

_____

[9] The parties are directed to www.qiblalocator.com/ .  This website enables a person to locate Florida State Prison both on a map and by satellite photograph, imposes the Qibla direction on the photograph, and gives the exact compass direction. The direction to the Qibla for Florida State Prison is 54.49 degrees north.  Perhaps officials of the Department of Corrections will use this website, or some other suitable source, to help Muslim inmates at the various prisons determine the direction of Mecca.

with the Second, Fourth, and Ninth Circuits that had previously recognized a prisoner's right to bodily privacy.  983 F.3d at 1030.  After finding that right (apparently a due process right), the Court remanded the case to the district court to apply the <u>Turner v. Safley</u> test[10] to determine whether the regulation challenged "unreasonably impinge[d] on the prisoners' constitutional rights to bodily privacy."  983 F.2d at 1026.

Plaintiff's RLUIPA claim, however, requires that Defendants show a compelling state interest for the substantial burden that has been placed upon Plaintiff's exercise of this religious tenet.  Defendants have shown that prisoners in close management must shower three times a week.  There is a genuine dispute of material fact as to whether a prisoner in close management may satisfy this requirement by a shower in his cell. Plaintiff avers that his cell is "equipped" for a shower, but that is doubtful.  He probably has only a sink.  A shower in the shower stall would result in better personal hygiene than washing with water from a sink.  Personal hygiene, to prevent the spread of contagious diseases and infections, is especially important when many people live together in close quarters.  But it will be assumed, however, that Plaintiff has a shower in his cell as Defendants have not challenged this assertion.

---

[10] <u>Turner v. Safley</u>, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987).  The <u>Turner</u> factors are: "(a) whether there is a 'valid, rational connection' between the regulation and a legitimate government interest put forward to justify it; (b) whether there are alternative means of exercising the asserted constitutional right that remain open to the inmates; (c) whether and the extent to which accommodation of the asserted right will have an impact on prison staff, inmates and the allocation of prison resources generally; and (d) whether the regulation represents an 'exaggerated response' to prison concerns."  <u>Fortner v. Thomas</u>, 983 F.2d at 1030, *quoting* <u>Harris v./ Thigpen</u>, 941 F.2d 1495, 1516 (11th Cir. 1991) (quoting <u>Turner</u>, 482 U.S. at 89-91, 107 S.Ct. at 2261-63).

Prisoners going to and from the shower wear boxer shorts and may also cover themselves with their towel.  There is no dispute, however, that this does not satisfy Plaintiff's religious rule.  Further, there is no dispute that while completely naked, either in the cell or in the shower, the form of Plaintiff's body from his navel to below his knees will be exposed to view.  Still, Defendants have a compelling interest to require prisoners to have routine complete showers, to maintain personal hygiene in a crowded environment, and have a compelling interest to make sure that the inmate is not engaging in any unauthorized activity during a shower.  This requires that a prisoner who is bathing remain visible to some correctional officer during the process.  Summary judgment should be granted to Defendants as to this RLUIPA claim.

### Gold crowns

Plaintiff has shown that getting rid of his gold crowns is a sincerely held religious belief, and that keeping them is sinful.  Plaintiff has shown that he is willing to pay the cost of replacement of the crowns.

Plaintiff has created a genuine dispute of material fact as to whether he refused to come to a dental appointment necessary to begin the planning for the removal of the crowns.  The dentists who provided evidence expect that this examination will be to determine whether there is a medical necessity to replace Plaintiff's crowns.  That is not the issue.  Further, the defense that the Department does not perform cosmetic dentistry is not a defense since Plaintiff has offered to pay for the new crowns.  Since Defendants have provided little else in defense of this claim, summary judgment in favor of Defendants as to this RLUIPA claim should be denied.

**First Amendment Halal diet claim**

The only First Amendment claim is based upon denial of a Halal diet.  Perhaps the seminal case on the exercise of religious rights in prison is O'Lone v. Estate of Shabazz, 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987).  The case involved a Muslim prisoner who was assigned to work outside the prison.  He wanted to be brought back inside the prison at noon on Fridays so that he could attend the congregational prayer required of him, known as Jumu'ah.  482 U.S. at 345-346, 107 S.Ct. at 2402-2403.  The Court held that while prisoners retain First Amendment rights, "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system."  482 U.S. at 348, 107 S.Ct. at 2404, quoting Price v. Johnston, 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948).  The Court said:

> In considering the appropriate balance of these factors, we have often said that evaluation of penological objectives is committed to the considered judgment of prison administrators, "who are actually charged with and trained in the running of the particular institution under examination."  To ensure that courts afford appropriate deference to prison officials, we have determined that prison regulations alleged to infringe constitutional rights are judged under a "reasonableness" test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights.  We recently restated the proper standard:  "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests."  This approach ensures the ability of corrections officials "to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration," and avoids unnecessary intrusion of the judiciary into problems particularly ill suited to "resolution by decree."

482 U.S. at 349-350, 107 S.Ct. at 2404-2405 (citations, including Turner, and footnotes omitted).

The reasonableness test, therefore, is more favorable to Defendants than the compelling state interest test of the RLUIPA.  Plaintiff's Halal diet claim survives the more demanding RLUIPA test.  It did so, however, because Defendants did not present any evidence to show any sort of penological interest, whether compelling or merely reasonable.  The Halal diet First Amendment claim should survive summary judgment, absent a defense, discussed ahead.

**Hala diet Equal Protection claim**

The only Equal Protection claim is based upon the denial of a Halal diet.

> The Equal Protection Clause requires that the government treat similarly situated people in a similar manner.  *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985).  In order "[t]o establish an equal protection claim, a prisoner must demonstrate that (1) 'he is similarly situated with other prisoners who received' more favorable treatment; and (2) his discriminatory treatment was based on some constitutionally protected interest, such as [religion]." *Jones v. Ray*, 279 F.3d 944, 946-47 (11th Cir.2001).

Boxer X v. Donald, 169 Fed.Appx. 555, 560 (11th Cir. 2006) (not selected for publication in the Federal Reporter, No. 05-14904).

The premise of the Equal Protection claim is that Jewish inmates received a special diet, and Plaintiff, an orthodox Sunni Muslim, did not.  Plaintiff has presented a genuine dispute of material fact as to the existence of an Equal Protection claim.  His demands for a highly structured diet are quite similar to the religious needs of an orthodox Jew, yet such a diet was provided at one time for orthodox Jewish prisoners.  A reasonable inference of religious discrimination arises from this evidence.  As explained earlier, Defendants have not submitted evidence to show a reasonable basis

for the difference. Absent a defense, the Halal diet Equal Protection claim should survive summary judgment.

The Jewish diet is no longer provided but it was for several years. There no longer is any basis for an Equal Protection claim seeking prospective equitable relief against any Defendant in his official capacity, and Plaintiff lacks standing to bring such a claim.[11] A monetary claim against any Defendant is not moot and may proceed, absent some other defense.

### Defenses to the First Amendment and Equal Protection Halal Claims

#### Eleventh Amendment immunity in official capacity and mootness

With the exception of the RLUIPA claim, Defendants sued in their official capacity for money damages have Eleventh Amendment immunity. Edelman v. Jordan, 415 U.S. 651, 94 S. Ct. 1347, 39 L. Ed. 2d 662 (1974); Scheuer v. Rhodes, 416 U.S. 232, 94 S. Ct. 1683, 40 L. Ed.2d 90 (1974). Defendants have Eleventh Amendment immunity from an award of nominal or punitive damages in their official capacities for the Halal diet, whether based upon the First Amendment or the Equal Protection Clause.

---

[11] To have standing to obtain prospective injunctive relief, Plaintiff must show that his injury is "actual or imminent, not conjectural or hypothetical." Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 211, 115 S.Ct. 2097, 2104, 132 L.Ed.2d 158 (1995); Church v. City of Huntsville, 30 F.3d 1332, 1337 (11th Cir. 1994). "[T]he fact of past injury, 'while presumably affording [the  plaintiff] standing to claim damages . . ., does nothing to establish a real and immediate threat that he would again' suffer similar injury in the future." Adarand, quoting Los Angeles v. Lyons, 461 U.S. 95, 105, 103 S.Ct. 1660, 1667, 75 L.Ed.2d  675 (1983). The claimant must show "a sufficient likelihood that he will again be wronged in a similar way." Lyons, 461 U.S. at 111, 103 S.Ct. at 1670.

Defendants who currently have official capacity to provide a remedy through declaratory or injunctive relief may be sued in their official capacities for such relief and the Eleventh Amendment is no bar.  Socialist Workers Party v. Leahy, 145 F.3d 1240, 1248 (11th Cir. 1998), Ex parte Young, 209 U.S. 123, 157, 28 S.Ct. 441, 453, 52 L.Ed. 714 (1908).  Thus, the First Amendment Halal diet claim for declaratory and injunctive relief against Defendants McNeil, Sapp, and Barber in their official capacities is not barred by the Eleventh Amendment.  The claim for declaratory and injunctive relief in official capacity is moot as to Crosby and McDonough, who no longer hold the position of Secretary of the Department of Corrections.

### Qualified immunity for damages in individual capacities

Plaintiff seeks nominal and punitive damages against Defendants in their individual capacities only as to the Halal claim.  As already noted, the RLUIPA does not recognize a Halal claim for damages against a defendant in his individual capacity, and there is no need for the defense of qualified immunity.

The First Amendment and Equal Protection Halal diet claim for monetary damages against Defendants in their individual capacities is subject to the defense of qualified immunity.  Qualified immunity protects a government official who was performing discretionary functions from an award of civil damages in his individual capacity unless the official violated "clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).  Where a defendant puts forth a qualified immunity defense, the Court "must conduct a two-part inquiry."  Saucier v. Katz, 533 U.S. 194, 200, 121 S.Ct. 2151, 2155, 150 L.Ed.2d 272 (2001), *cited in* Vaughan v. Cox,

316 F.3d 1210, 1212 (11th Cir. 2003).  First, it must be determined whether the facts, viewed in the light most favorable to the plaintiff show that the defendant violated plaintiff's constitutional rights.  Saucier, 533 U.S. at 201, 121 S.Ct. at 2156.  If it appears that a plaintiff's constitutional rights were violated, then the Court must determine whether the right violated "was clearly established – that is, whether it would have been clear to a reasonable officer that [the] conduct was unlawful."  Id., at 202, 121 S.Ct. at 2156; Vaughan, 316 F.3d at 1212; see also Conn v. Gabbert, 526 U.S. 286, 290, 119 S.Ct. 1292, 1295, 143 L.Ed.2d 399 (1999), citing Siegert v. Gilley, 500 U.S. 226, 232-233, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991), and County of Sacramento v. Lewis, 523 U.S. 833, 841, n. 5, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) (noting the first step is to "determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation.").  Qualified immunity does not require that there be materially similar cases, only that the unlawfulness of an act or omission be apparent in light of pre-existing law.  Hope v. Pelzer, 536 U.S. 730, 122 S.Ct. 2508, 2516, 153 L.Ed.2d 666 (2002), reversing Hope v. Pelzer, 240 F.3d 975 (11th Cir. 2001).  Accordingly, the question to ask is whether the law would give a reasonable official "fair warning" that his alleged conduct was unconstitutional.  Hope, 122 S.Ct. at 2516; Vaughan, 316 F.3d at 1212.

To prevail on the First Amendment claim, Plaintiff will have to show that Defendants have no reasonable penological objective in not providing a full Halal diet. To prevail on the Equal Protection claim, he will have to show much the same thing, though he will have some help in comparing the diet he seeks to the Jewish diet that

was provided for a few years.  The diet Plaintiff seeks is not a matter of pork-free meals.

It is not a matter of special food only for holy days.  The diet Plaintiff seeks would

require the Department of Corrections to set up a completely separate Sunni Muslim

kitchen, staffed entirely by Sunni Muslims, to provide meals to Plaintiff.  It is highly

doubtful that these First Amendment or Equal Protection claims will succeed.

Plaintiff cites no clearly establish law that would have given some advance

warning to Defendants, as reasonable people, that the failure to provide a full Halal diet

would violate Plaintiff's First Amendment or Equal Protection rights.  The cases cited by

Plaintiff, at most, only apply to special occasions, such as Ramadan.  Doc. 205, pp. 36-

37.

The only religious diet case in this circuit of note is Martinelli v. Dugger, 817 F.2d

1499 (11th Cir. 1987), *cert. denied*, 484 U.S. 1012 (1988).  That case simply remanded

to order that the Jewish prisoner be "allowed to eat in the pork-free line when available,

and at all other meal times, he shall be permitted to choose items which are not pork in

the regular serving line."  817 F.2d at 1508.  That is exactly what has been afforded

Plaintiff.  Indeed, Plaintiff was provided a pork-free meal all of the time.

Further, Martinelli is not good law for the standard it employed.  The court held

that "[w]hen the court finds that the inmate has a sincere free exercise claim, this circuit

assesses the validity of the prison practice under the 'least restrictive means' test."  817

F.2d at 1505.  The court noted that the Supreme Court had granted certiorari in O'Lone

to decide the conflict in the circuits.  *Id.*, at 1505 n. 22.  As noted above,  O'Lone opted

for the reasonableness test for prison First Amendment claims, not the least restrictive

means.

Finally, a fully litigated orthodox Jewish diet claim (RLUIPA, First Amendment, and Equal Protection) recently failed in the Texas case discussed above.  Baranowski v. Hart.  Thus, Defendants are entitled to qualified immunity against an award of damages against them in their individual capacities for the First Amendment and Equal Protection claims.

### *Respondeat superior*

A prison official cannot be named as a Defendant in a civil rights case merely because he or she has supervisory authority over others.  The doctrine of *respondeat superior* does not provide a basis for recovery under § l983.  Harvey v. Harvey, 949 F.2d 1127, 1129 (11th Cir. 1992), *citing* Monell v. Department of Social Services, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978).  Although personal participation is not specifically required for liability under § l983, there must be some causal connection between each defendant named and the injury allegedly sustained.  Swint v. City of Wadley, 51 F.3d 988, 999 (11th Cir. 1995), *citing* Rivas v. Freeman, 940 F.2d 1491, 1495 (11th Cir. 1991) and Zatler v. Wainwright, 802 F.2d 397, 401 (11th Cir. 1986).

Secretary McNeil is currently in charge of the entire Department of Corrections.  Plaintiff asserts that Defendant Sapp is the current Assistant Secretary of Institutions and Barber is the Deputy Assistant Secretary of Institutions.  Doc. 205, p. 9.  Both Sapp and Barber are charged with management and supervision of institutions, and implement policies established by Secretary McNeil.  *Id.*  Crosby and McDonough both formerly were Secretary of the Department.

While not a matter of *respondeat superior*, there is no causal connection between adoption of the policies and actions by Sapp or Barber.  All they are alleged to do or

have done is implement the policies of the Secretary.  All claims against Crosby, McDonough, Sapp, and Barber should be dismissed for lack of a causal connection or lack of current official duties.

**Conclusion**

Accordingly, it is **RECOMMENDED** that Defendants' motion for summary judgment, doc. 114, be **GRANTED** as to all claims and Defendants except that the motion for summary judgment be **DENIED** with respect to (1) the official capacity RLUIPA **Halal diet** claim against Secretary McNeil for declaratory relief, injunctive relief, and nominal damages, (2) the First Amendment **Halal diet** claim against Secretary McNeil for declaratory and injunctive relief only, and (3) the official capacity RLUIPA **gold crowns** claim against Secretary McNeil for declaratory and injunctive relief only, and that the court not direct entry of judgment.

**IN CHAMBERS** at Tallahassee, Florida, on February 29, 2008.


**s/     William C. Sherrill, Jr.**
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**


**NOTICE TO THE PARTIES**

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 10 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**