**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**


**AKEEM MUHAMMAD,**

      **Plaintiff,**

**vs.**                                  **Case No. 4:05cv193-WS/WCS**

**WALTER McNEIL, Secretary,
Florida Department of Corrections,**

      **Defendant.**

_____/


**AMENDED REPORT AND RECOMMENDATION**[1]

      Defendant has filed a renewed motion for summary judgment.  Doc. 312.  The

motion supplements the earlier filed motion for summary judgment, doc. 272, and

incorporates it by reference.  Plaintiff was given notice of his responsibilities to file a

response to this motion, and June 15, 2009, was set for taking the motion under

advisement.  Docs. 319, 327.  Plaintiff filed a response to the motion for summary

---

[1] This report and recommendation is substituted for the report and
recommendation entered on June 17, 2009.  It is entered to consider Plaintiff's response
to Defendant's motion for summary judgment.  Doc. 332.  Although the response was
not docketed until after the June 15th deadline and after the docketing of the last report
and recommendation, it was timely filed by submission to prison officials for mailing.

judgment.  Doc. 332.  Plaintiff also filed a motion for a preliminary injunction, doc. 329, with an affidavit.

Finally, Plaintiff has filed another motion for an extension of time to obtain affidavits.  Doc. 331.  He states that he expected to receive affidavits from Dr. Abdul Hamid and an licensed nutritionist by June 25, 2009, but the affidavits still have not been filed.  Plaintiff states that he did not learn of the new address of a dentist, Dr. Courten, until June 1, 2009, but he has still not filed an affidavit from Dr. Courten.  As Plaintiff himself has said, he and Defendant have had four years to develop this summary judgment record.  Doc. 332, p. 22.  All of this evidence could have been gathered long ago.  The motion for an extension of time will again be denied by separate order.

**The claims that remain**

The Fourth Amended complaint, doc. 284, was permitted so that Plaintiff could clarify his Halal diet and gold crown claims.  Doc. 289.  Those claims remain pending only to the extent provided by the order of May 29, 2008, doc. 233.  *Id.*  The claims remaining are:  (1) an official capacity RLUIPA Halal diet claim against Secretary McNeil for declaratory relief, injunctive relief, and nominal damages; (2) a First Amendment Halal diet claims against Secretary McNeil for declaratory and injunctive relief only; and (3) an official capacity RLUIPA gold crowns claim against Secretary McNeil for declaratory and injunctive relief only.

**Halal diet**

Plaintiff alleges that it is his sincere religious belief that he may not consume meat that has not been slaughtered according to Islamic law, or alcohol products or by-products, or any food that has touched or been contaminated by such foods.  Fourth Amended Complaint, doc. 284, ¶ 5.  Plaintiff alleges that his religion requires that he "consume ONLY *uncooked vegetarian products*" free of meat or alcohol products or by-products.  *Id.* (emphasis added).  He describes this diet as including bread, cheese, peanut butter, milk, raw vegetables, fruit, nuts, pretzels, granola, saltines, nutritional drinks, cookies, and tinned fish.  *Id.*, ¶ 5, n. 1.  Plaintiff alleges that the "regular, vegan and alternate entre diets" provided by Defendant do not comply with these rules because that food has been contaminated by improper meat or alcohol products or by-products.  *Id.*, ¶ 7.  He seeks an injunction to require Defendant to provide this diet to him, or to provide as close a diet as possible.  *Id.*, p. 11.

Although Plaintiff argues in his response to the motion for summary judgment that his dietary claim would be completely satisfied if he were to be provided "an alcohol-free lacto-vegetarian diet that is served on non-disposable trays that are not used to serve non-vegetarian diets," doc. 332, p. 20, elsewhere he states that he seeks:

> 1) a cooked lacto-vegetarian diet, 2) a diet that is free of all alcohol products or by-products, 3) a diet that is served on NON-disposable trays that are not also used to serve meat or alcohol products or by-products, 4) a diet that is not prepared with utensils that are also used to prepare meat or alcohol products or by-products, or 5) a diet that has an official requirement that it not be contaminated with meat or alcohol products or by-products.

Doc. 332, pp. 18-19.  As he has done on other occasions, Plaintiff explains with specificity how commercially available food often contains trace amounts of alcohol or

by-products from improper meat (from animals that have not been ritually slaughtered), and how food served to prisoners is contaminated with non-Halal food because it is prepared in a common kitchen with common utensils.  Doc. 332, pp. 9-10.

**Gold crowns**

Plaintiff alleges that he has 16 gold crowns in his teeth, installed in his youth.  *Id.*, ¶ 11.  He asserts that this violates a tenet of his religion.  *Id.*, ¶ 12.  He alleges that his family and friends "will pay the cost for removal of his gold crowns."  *Id.*, ¶ 13.  He seeks an injunction to require Defendant to "arrange for the removal of Plaintiff's gold crowns, either by using prison dentists or by allowing a dentist chosen by Plaintiff to come into the institution to remove the crowns, all at Plaintiff's expense."  *Id.*, p. 11.

**Legal standards governing a motion for summary judgment**

On a motion for summary judgment Defendants initially have the burden to demonstrate an absence of evidence to support the nonmoving party's case.  Celotex Corporation v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 2553-54, 91 L.Ed.2d 265 (1986).  If they do so, the burden shifts to the Plaintiff to come forward with evidentiary material demonstrating a genuine issue of material fact for trial.  *Id.*  Plaintiff must show more than the existence of a "metaphysical doubt" regarding the material facts, Matsushita Electric Industrial Co., LTD. v. Zenith Radio Corporation, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986), and a "scintilla" of evidence is insufficient. There must be such evidence that a jury could reasonably return a verdict for the party bearing the burden of proof.  Anderson v. Liberty Lobby, 477 U.S. 242, 251, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).  An issue of fact is "material" if it could affect the outcome of the case.  Hickson Corp. v. Northern Crossarm Co., Inc., 357 F.3d 1256,

1259 (11th Cir. 2004) (citations omitted).  However, "the evidence and inferences drawn from the evidence are viewed in the light most favorable to the nonmoving party, and all reasonable doubts are resolved in his favor."  WSB-TV v. Lee, 842 F.2d 1266, 1270 (11th Cir. 1988); Watkins v. Ford Motor Co., 190 F.3d 1213, 1216 (11th Cir. 1999) ("We are required to resolve all reasonable inferences and facts in a light most favorable to the nonmoving party.").

"Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' "  Owen v. Wille, 117 F.3d 1235, 1236 (11th Cir. 1997), cert. denied 522 U.S. 1126 (1998), quoting Celotex, 477 U.S. at 324, 106 S. Ct. at 2553 (quoting Fed. R. Civ. P. 56(c), (e)).  The nonmoving party need not produce evidence in a form that would be admissible as Rule 56(e) permits opposition to a summary judgment motion by any of the kinds of evidentiary materials listed in Rule 56(c).  Owen v. Wille, 117 F.3d at 1236; Celotex, 477 U.S. at 324, 106 S. Ct. at 2553.

Local Rule 56.1(A) provides that a motion for summary judgment "shall be accompanied by a separate, short and concise statement of the material facts as to which the moving party contends there is no genuine issue to be tried.  Failure to submit such a statement constitutes grounds for denial of the motion."  The Local Rule also provides that the statement "shall reference the appropriate deposition, affidavit, interrogatory, admission, or other source of the relied upon material fact, by page, paragraph, number, or other detail sufficient to permit the court to readily locate and check the source."  The Local Rule provides that the party opposing the motion shall

serve a similar statement of material facts as to which the party contends there is a genuine issue to be tried, using the same format.  Finally, the Local Rule provides that the movant's properly filed statement of undisputed facts will be deemed to be admitted unless controverted by the opposing party in the manner specified by the Rule.  *See* Jones v. Gerwens, 874 F.2d 1534, 1537 n.3 (11th Cir. 1989) (determining that plaintiff's failure to controvert defendants' statement of undisputed facts filed in compliance with a similar local rule of the Southern District of Florida constituted an admission that such facts were not disputed for summary judgment purposes.)

**Rule 56(e) evidence**

### Plaintiff's evidence

Plaintiff asserts (and Defendant does not dispute) that it is a fundamental tenet of his religion that he not eat meat that has not been slaughtered in a ritually acceptable manner, and not eat any food contaminated with such meat.  Doc. 329, affidavit of Akeem Muhammad, ¶ 2, doc. 329-2.  Plaintiff states that since 1999, he has suffered from colitis and irritable bowel syndrome, and eating fruit, vegetables, or a significant amount of beans severely aggravates his condition.  *Id.*, ¶ 3.  Physicians have prescribed a diet so that he can avoid these foods.  *Id.*

The Florida Department of Corrections offers meals that are contaminated with improperly slaughtered meat, which he cannot eat due to his religion, but offers a non-meat alternative entree.  *Id.*, ¶ 4.  Prior to April 30, 1999, Plaintiff was allowed to add the non-meat alternative entree to his therapeutic diet.  *Id.*, ¶ 5.  Plaintiff states that on April 30, 2009, Dr. Malaver "placed me on a low residue diet, which is meat based and otherwise consists of 16 meat based meals per week."  *Id.*, ¶ 6.  He has now been told

he cannot substitute the non-meat alternative entree for the meat entree.  *Id.*, ¶ 7.  As a result, Plaintiff states that now he is only provided the therapeutic diet, and 16 of 21 of those meals are contaminated with meat forbidden by his religion.  *Id.*, ¶ 8.  He must refuse these 16 meals.  *Id.*

Plaintiff has also filed an affidavit of Ahmed Sadek Ahmed, who is qualified to speak on Shariah (Islamic) law.  Doc. 329, affidavit of Ahmed Sadek Ahmed, ¶ 2, doc. 329-2.  Ahmed confirms that only meat from animals slaughtered in accordance with Islamic procedure is considered "halaal," and to eat other meat is a sin.  *Id.*, ¶¶ 9, 18, 19.  He states that Muslims cannot eat even non-meat food prepared in a kitchen where "haraam" food is prepared.  *Id.*, ¶ 21.  He states that if a separate kitchen cannot be provided, Plaintiff should be served "uncooked non-meat foods such as peanut butter, bread, cheese, tuna and other tinned fish, etc."  *Id.*, ¶ 22.

Ahmed states that the wearing of gold is forbidden for Muslim males.  *Id.*, ¶ 15.  Plaintiff has been told that "it was his religious obligation to have the gold teeth removed."  *Id.*  Defendant does not dispute this.

Plaintiff repeats this evidence as to his dietary claim in his last response to the motion for summary judgment.  Doc. 332.  There is no need to repeat that evidence here.

With respect to the gold crowns claim, Plaintiff asserts that it would take only 8 hours to remove his gold crowns and replace them with new crowns.  Doc. 332, p. 30.  Plaintiff refers to his own affidavit, but there he simply repeats what a dentist, Dr. Courten, told him.  Doc. 332, Ex. A, p. 14; doc. 332-3, p. 14 on ECF.  Plaintiff is not qualified to give an expert opinion as to a dental procedure, and therefore he may not

rely upon hearsay evidence from another expert.  Dr. Courten's proposed affidavit has also been filed, but it is not signed.  Doc. 332, Ex. V; doc. 332-4, p. 100 on ECF.

Plaintiff also asserts that he is willing to wait his turn at Florida State Prison for removal of the gold crowns as routine dental care, even if this wold take "years."  Doc. 332, Ex. A, p. 15; doc. 332-2, p. 15 on ECF.  He also states he is willing to have all 16 teeth pulled and replaced with dentures.  *Id.*, Ex. A, p. 14; doc. 332-2, p. 14 on ECF.  In response to Plaintiff's interrogatory, Defendant states under oath that removal of Plaintiff's teeth could be accomplished at Florida State Prison "if removal of the teeth was clinically indicated.  However, it is not clinically indicated and would be a violation of the standard of care."  *Id.*, Ex. E, interrogatory 3; doc. 332-3, p. 55 on ECF.

**Defendant's evidence**

Defendant's evidence only addresses the costs and security problems that would be caused if Plaintiff were to be granted the requests at issue in this suit.  Defendant does not dispute that it is a tenet of Plaintiff's religion that he eat the diet that he seeks or that he have his gold crowns removed.

The Jewish Dietary Accommodations Program was discontinued on August 16, 2007.  Doc. 312, affidavit of Kathleen Fuhrman, ¶ 2.  Ms. Fuhrman has a Master of Science in Dietetics and Nutrition, and is a licensed dietitian and nutritionist.  *Id.*  She is the current Public Health Nutrition Program Manager for the Department, and is involved in the planning of food service delivery to all inmates.  *Id.*

The Florida Department of Corrections has three options to provide a Halal diet to Plaintiff and other Muslim prisoners in the manner requested by Plaintiff.  *Id.*, ¶ 6.  First, prepackaged Halal meals could be purchased.  *Id.*  Second, "commercially

available vegetarian products" could be provided from existing prison kitchens.  *Id.*
Third, separate kitchens could be set up to provide a Halal diet of the type sought by
Plaintiff.  *Id.*

The first option involves purchasing prepackaged meals from private vendors.
Two prepackaged Halal meals would provide less than one-third of the calories served
daily to prisoners, and such meals would have to be heavily supplemented with eggs,
fruits, vegetables, cereal, juice, peanut butter, and similar items.  *Id.*, ¶ 6a.  Currently,
the Department of Corrections spends $832.20 per year to feed a prisoner.  *Id.*  It would
cost $5,475.00 per year to feed a Halal diet to a prisoner using prepackaged meals.  *Id.*
Additional costs would be incurred "for dedicated food preparation equipment and
serving items."  *Id.*  The Department now has about 3,560 inmates who have
designated Islam as their religious preference.  *Id.*  It would cost an additional
$16,528,368.00 per year to feed these prisoners the Halal diet sought by Plaintiff using
the first option.  The first option is "extremely cost prohibitive."  *Id.*, ¶ 6.  Plaintiff has not
disputed this evidence as to these costs.

Ms. Fuhrman states that Plaintiff would not receive a nutritionally adequate diet
using the second option.  *Id.*, ¶ 6b.  The fat intake would exceed that recommended for
Plaintiff's medical condition, a diet of raw fruits and vegetables "may exacerbate
[Plaintiff's] current medical condition," and this diet would result in too much calcium per
day, possibly causing hypercalcemia or calcium deposits.  *Id.*  Plaintiff argues that the
nutritional problem suggested by Ms. Fuhrman is not so, but he has no expertise with
respect to nutrition.  Further, Plaintiff has presented evidence of an unsolvable dilemma
as to the second option.  Were he to be given a diet of raw fruits and vegetables,

presumably this would satisfy his need to have food uncontaminated by alcohol or improper meat products, but Plaintiff's colitis and intestinal problems make this impossible.

Addressing the contamination problem and the third option, Ms. Fuhrman states that to provide a Halal diet to all 3,560 Muslim prisoners using the third option would cause the Department to have to build an additional 45 kitchens.  *Id.*, ¶ 6c.  These costs are prohibitive, in her opinion, as outlined in the affidavits of Norman Thigpen and Mark Tallent.  *Id.*

Mark Tallent is the Chief of Budget and Management Evaluation for the Department.  Doc. 312, affidavit of Mark Tallent, ¶ 2.  He states that currently there are no funds available to provide Halal diets to Muslim inmates as sought by Plaintiff.  *Id.*, ¶ 6.  He states that building new kitchens and proving equipment would require a fixed capital outlay appropriation from the legislature.  *Id.*, ¶ 7.

Norman A. Thigpen is the Food Services Administrator for the Department.  Doc. 272, affidavit of Norman A. Thigpen, ¶ 1.  He estimates that it would cost $1,925,955 to provide equipment for 45 separate Halal diet kitchens, and it could cost $8,802,000 in new construction costs.  *Id.*, ¶¶ 6, 7.  Further, it would cost $523,500 annually to provide disposable trays, cups, and sporks to serve Muslim prisoners in confinement.  *Id.*, ¶ 8.

James Upchurch is the Chief of the Bureau of Security Operations for the Department of Corrections.  Doc. 272, affidavit of James Upchurch, ¶ 1.  He has been involved in corrections security for over 35 years.  *Id.*  It is his opinion that providing a special diet to Plaintiff and other Muslim prisoners would impair prisoner morale and prison security.  *Id.*, ¶ 6.  Other prisoners would believe that the Halal diet was of better

quality or quantity.  *Id.*, ¶ 7.  This could cause prisoners to claim to be Muslims to obtain the diet, or could cause other prisoners to retaliate against Muslims because it would be thought that the diet was better in quality or quantity.  *Id.*, ¶¶ 7, 9.  Further, if the diet could only be provided by specialized kitchens, this condition would allow prisoners who are gang members to falsely claim to be Muslims in order to be assigned together at a particular institution to allow them to associate for gang purposes.  *Id.*, ¶ 8.  Finally, a separate Halal kitchen would require additional security staffing, thus impairing security in other areas of the institution.  *Id.*, ¶ 10.

Thomas E. Shields, D.D.S., is the Director of Dental Services for the Department and is a licensed dentist.  Doc. 272, affidavit of Thomas E. Shields, ¶¶ 1, 2.  Since there is no evidence to the contrary, he is a competent expert to give the opinions which follow.  He states that Plaintiff has no medical condition warranting removal of his gold crowns.  *Id.*, ¶ 9.  The crowns are permanently cemented to Plaintiff's teeth.  *Id.*, ¶ 10. Removal of the gold crowns is cosmetic surgery.  *Id.*  Removal of the crowns may damage Plaintiff's teeth because the gold crowns will have to be cut off.  *Id.*  He states that "the dental work in this case would amount to basically a full mouth rehabilitation." *Id.*  Dr. Shields states that transporting Plaintiff to a place for removal of the crowns "will place a tremendous burden on the already strained resources of the Department that will impact security, classification, and the dental department."  *Id.*, ¶ 11.  Removal of the crowns would occur at the Reception and Medical Center, will entail 10 or more dental visits, and Plaintiff would have to be transported from Florida State Prison to the Reception and Medical Center.  *Id.*  This will cause the need for additional security staff to do the transportation.  *Id.*, ¶ 12.  Providing cosmetic dentistry to Plaintiff would place

him ahead of many other prisoners who have serious medical needs for dental treatment.  *Id.*, ¶ 13.  It would also impact good order and security because other prisoners would perceive this to be preferential dental treatment for Plaintiff.  *Id.*, ¶ 15.

James Upchurch states that the option of transporting Plaintiff to a location outside of the Department of Corrections for removal of the gold crowns, or permitting a dentist to enter the Department of Corrections to perform the dental work, raises "serious security concerns."  Doc. 312, affidavit, ¶ 4.  Upchurch states that if Plaintiff were to have his gold crowns removed at Florida State Prison, other prisoners would see this as preferential treatment because Plaintiff would be receiving dental care ahead of other prisoners with dental needs.  *Id.*, ¶ 6.  This could lead to unrest and retaliation by other prisoners against Muslim prisoners.  *Id.*, ¶ 8.  He also points out that this would set a dangerous precedent, as the Department then would have to permit other prisoners to have cosmetic surgery, such as removal of tattoos at their own expense.  *Id.*, ¶ 7.

**Legal analysis**

### Official capacity RLUIPA Halal diet claim against Secretary McNeil

As explained in <u>Smith v. Allen</u>, 502 F.3d 1255 (11th Cir. 2007) the RLUIPA:

states that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability," unless the government can demonstrate that the burden "is in furtherance of a compelling governmental interest" and "is the least restrictive means of furthering that compelling governmental interest."  42 U.S.C. § 2000cc-1(a).  Section 3 of RLUIPA thereby affords to prison inmates a "heightened protection from government-imposed burdens," by requiring that the government demonstrate that the substantial burden on the prisoner's religious exercise is justified by a compelling, rather than merely a legitimate, governmental interest.  *See Warsoldier v. Woodford*, 418

F.3d 989, 994 (9th Cir. 2005) (citation omitted).  In doing so, section 3 affords confined persons "greater protection of religious exercise than what the Constitution itself affords."  *Lovelace v. Lee*, 472 F.3d 174, 186 (4th Cir. 2006).  Section 3 applies whenever "the substantial burden on religious exercise is imposed in a program or activity that receives federal financial assistance."  42 U.S.C. § 2000cc-1(b)(1).

502 F.3d at 1266.  Thus,

> [t]o establish a *prima facie* case under section 3 of RLUIPA, a plaintiff must demonstrate 1) that he engaged in a religious exercise; and 2) that the religious exercise was substantially burdened. *See Adkins*,[2] 393 F.3d at 567; 42 U.S.C. § 2000cc-1(a).  The plaintiff "bear[s] the burden of persuasion on whether the . . . government practice that is challenged by the claim substantially burdens the exercise of religion."  42 U.S.C. § 2000cc-2(b).  If the plaintiff succeeds in demonstrating a *prima facie* case, the government must then demonstrate that the challenged government action is [sic] "is in furtherance of a compelling governmental interest" and "is the least restrictive means of furthering that compelling governmental interest."  42 U.S.C. §§ 2000cc-1(a), 2000cc-2(b).  In contrast, if the plaintiff fails to present evidence to support a *prima facie* case under RLUIPA, the court need not inquire into whether the governmental interest at stake was compelling.  *See Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1228 (11th Cir. 2004).

502 F.3d at 1276.

That a compelling state interest is required by the RLUIPA does not mean that courts should no longer give substantial deference to the decisions of prison administrators.  In <u>Cutter v. Wilkinson</u>, 544 U.S. 709, 125 S.Ct. 2113, 161 L.Ed.2d 1020 ( 2005), the Supreme Court said:

> We do not read RLUIPA to elevate accommodation of religious observances over an institution's need to maintain order and safety.  Our decisions indicate that an accommodation must be measured so that it does not override other significant interests.  In *Caldor*,[3] the Court struck down a Connecticut law that "arm[ed] Sabbath observers with an absolute

---

[2] <u>Adkins v. Kaspar</u>, 393 F.3d 559, 566 (5th Cir. 2004).

[3] <u>Estate of Thornton v. Caldor, Inc.</u>, 472 U.S. 703, 105 S.Ct. 2914, 86 L.Ed.2d 557 (1985).

and unqualified right not to work on whatever day they designate[d] as their Sabbath."  472 U.S., at 709, 105 S.Ct. 2914.  We held the law invalid under the Establishment Clause because it "unyielding[ly] weigh[ted]" the interests of Sabbatarians "over all other interests."  *Id.*, at 710, 105 S.Ct. 2914.

We have no cause to believe that RLUIPA would not be applied in an appropriately balanced way, with particular sensitivity to security concerns. While the Act adopts a "compelling governmental interest" standard, *see supra*, at 2118, "[c]ontext matters" in the application of that standard.  *See Grutter v. Bollinger*, 539 U.S. 306, 327, 123 S.Ct. 2325, 156 L.Ed.2d 304 (2003).  Lawmakers supporting RLUIPA were mindful of the urgency of discipline, order, safety, and security in penal institutions.  *See, e.g.*, 139 CONG. REC. 26190 (1993) (remarks of Sen. Hatch).  They anticipated that courts would apply the Act's standard with "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources."  Joint Statement S7775 (quoting S.Rep. No. 103-111, at 10, U.S.CODE CONG. & ADMIN.NEWS 1993, pp. 1892, 1899, 1900).

544 U.S. at 722-723, 125 S.Ct. at 2122-2123 (footnotes omitted).

"[T]o constitute a substantial burden under RLUIPA, the governmental action must significantly hamper one's religious practice."  502 F.3d at 1277.  That question turns, in part, upon the degree to which the particular practice has been shown by the plaintiff to be fundamental to the exercise of the particular religion such that the denial of it would cause "more than an inconvenience on [his] religious exercise."  502 F.3d at 1278 (quoting Midrash, 366 F.3d at 1227).  Stated another way,

a "substantial burden" must place more than an inconvenience on religious exercise; a "substantial burden" is akin to significant pressure which directly coerces the religious adherent to conform his or her behavior accordingly.  Thus, a substantial burden can result from pressure that tends to force adherents *to forego religious precepts* or from pressure that mandates religious conduct.

Midrash Sephardi, Inc. v. Town of Surfside, 366 F.3d 1214, 1227 (11th Cir. 2004) (emphasis added), *cert. denied*, 543 U.S. 1146 (2005).  The existence of alternative

means of religious expression is relevant to whether a substantial burden has been shown. *Id.*, citing Cheffer v. Reno, 55 F.3d 1517, 1522 (11th Cir.1995). A plaintiff's failure to show a substantial burden results in a failure to prove a *prima facie* case. Smith v. Allen, 502 F.3d at 1279.

In Baranowski v. Hart, 486 F.3d 112 (5th Cir.), *cert. denied*, 128 S.Ct. 707 (2007), the court had before it similar claims, a First Amendment free exercise claim, and Equal Protection claim, and a RLUIPA claim concerning a Jewish kosher diet for a Texas prisoner. Applying the RLUIPA, the court found that a Jewish kosher diet was a valid exercise of the prisoner's religious belief and that failure to provide the diet substantially burdened his free exercise of that belief. 486 F.3d at 124-125.

The court held, however, that the RLUIPA was not violated because the "dietary policy of not providing kosher meals is the least restrictive means of furthering a compelling governmental interest." *Id.*, at 125. The court quoted from an affidavit submitted by the Director of the Texas Chaplaincy Department, which stated:

> TDCJ has determined that it would be far too costly and would far exceed the allotted budget to provide kosher food. No TDCJ unit is currently set up to accommodate a kosher diet, which requires food preparation under certain ritual requirements and without contact with non-kosher food. Given the small number of offenders identifying themselves as Jewish (and the small number recognized as practicing Jews by TDCJ Jewish authorities), and their various classification and programmatic needs, at least several units would have to remodel their kitchens and substantially alter food preparation procedures. Kosher meals also are very costly. *The state of Florida has reported that it costs them between 12 and 15 dollars per day per offender to provide kosher meals* compared with $2.46 per day the State of Texas pays for offender meals. Providing kosher meals for a very small subset of offenders would place a tremendous burden on the ability of TDCJ to provide a nutritionally appropriate meal to all other offenders because of the budgetary impact alone. Furthermore, due to budget deficits, the Texas Legislature at the last legislative session specifically targeted inmate food services for a mandatory reduction in the

> biennial of more than $6 million.  Providing kosher meals would put a
> great strain on an already strained system, and would raise resentment
> among other inmates because payments for kosher meals would of
> necessity come out of the general food budget for all inmates. The
> problem would be compounded because inmates of other faiths would
> seek similar privileges.

*Id.*, at 117 (emphasis added).  The court reasoned:

> The uncontroverted summary judgment evidence submitted by
> Defendants establishes that TDCJ's budget is not adequate to cover the
> increased expense of either providing a separate kosher kitchen or
> bringing in kosher food from the outside; that TDCJ's ability to provide a
> nutritionally appropriate meal to other offenders would be jeopardized
> (since the payments for kosher meals would come out of the general food
> budget for all inmates); that such a policy would breed resentment among
> other inmates; and that there would be an increased demand by other
> religious groups for similar diets.

*Id*. The court affirmed the trial court's grant of summary judgment to Defendants as to

this RLUIPA claim.

That is the case here.  While Plaintiff has shown that the exercise of his religious

beliefs regarding diet is substantially burdened, Defendant has shown that providing the

Halal diet that Plaintiff seeks is far too costly.  If Plaintiff were to be provided this diet, so

too would every Muslim prisoner and every other prisoner whose religion has strict

dietary laws (*e.g.*, Hebrew Israelites, Seventh Day Adventists, and Jewish prisoners).

The costs of providing prepackaged meals would solve the problem of contamination in

preparation, but the cost is too much and prepackaged meals would not provide a fully

nutritional diet unless augmented with other food.

If Halal meals are to be prepared within the Department of Corrections, the costs

of keeping Halal foods separate from other foods is too much.  The Department would

first have to find food that have no traces of meat or alcohol, and keep those foods

separate from the food of all other prisoners.  Separate kitchens would be needed, with separate staffing.  It is completely impractical, from a cost perspective, especially in these hard economic times, to require the Florida Department of Corrections to buy prepackaged Halal meals or to build and operate separate Halal kitchens for Muslim prisoners.

Further, the security problems that would be created if such a separate diet were to be provided would be immense.  Other prisoners would perceive that Muslim prisoners were receiving preferential treatment, and that their diet, because it is far more costly, is better in quality and quantity.  It does not matter that the meals might not be of higher quality.  The different treatment and different cost would create a perception of special treatment.  Other prisoners would manipulate the system to obtain the diet or to try to be assigned to a prison with such a kitchen.  All of these, considered separately and together, are compelling state interests.

Defendant has shown that denial of Plaintiff's Halal dietary requests is the least restrictive means of securing Defendant's compelling interests.  Either Plaintiff is provided the full diet he seeks, without cross contamination of non-Halal foods, or he is not.  Serving meals on dedicated trays would not satisfy Plaintiff's demands as the foods would have to be Halal (containing no traces of meat or alcohol) and served from a dedicated Halal kitchen.  Plaintiff has not suggested any reasonable alternatives.  Defendant is entitled to summary judgment as to this claim.  *See also*, Linehan v. Crosby, Case No. 4:06cv225-MP/WCS, docs. 90 (report and recommendation) and 95 (order adopting).

### First Amendment Halal diet claim against Secretary McNeil

In O'Lone v. Estate of Shabazz, 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987), a Muslim prisoner assigned to work outside the prison wanted to be brought back inside the prison at noon on Fridays so that he could attend the congregational prayer required of him known as Jumu'ah.  482 U.S. at 345-346, 107 S.Ct. at 2402-2403.  The Court held that while prisoners retain First Amendment rights, "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system."  482 U.S. at 348, 107 S.Ct. at 2404, quoting Price v. Johnston, 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948).  The Court said:

> In considering the appropriate balance of these factors, we have often said that evaluation of penological objectives is committed to the considered judgment of prison administrators, "who are actually charged with and trained in the running of the particular institution under examination."  To ensure that courts afford appropriate deference to prison officials, we have determined that prison regulations alleged to infringe constitutional rights are judged under a "reasonableness" test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights.  We recently restated the proper standard:  "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests."  This approach ensures the ability of corrections officials "to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration," and avoids unnecessary intrusion of the judiciary into problems particularly ill suited to "resolution by decree."

482 U.S. at 349-350, 107 S.Ct. at 2404-2405 (citations, including Turner, and footnotes omitted).

The reasonableness test, therefore, is more favorable to Defendant than the compelling state interest test of the RLUIPA.  Since Defendant is entitled to summary

judgment as to the RLUIPA claim, he is entitled to summary judgment as to the First Amendment Halal diet claim.

### The official capacity RLUIPA gold crowns claim against Secretary McNeil

Plaintiff has alleged that he would arrange to have his gold crowns removed at his own expense but he has presented no evidence to support this assertion.  The dental procedure is major reconstructive surgery.  Plaintiff will need 10 or more separate dental sessions to cut off his 16 gold crowns.  There is no competent evidence that the removal and replacement of the 16 crowns could be done int 8 hours.  The procedures will be expensive.  The claim fails completely for lack of evidence that Plaintiff will pay for the procedures.

Even if there were evidence that Plaintiff will bear the cost, the claim fails. Although Plaintiff is willing to have the procedures done as routine care at Florida State Prison over a period of years, other prisoners with serious medical needs for dental care, or merely for routine care, would be deprived of such care while Plaintiff occupied the dental chair during these 10 or more dental sessions.  This would occur whether the procedures were performed by Department of Corrections dentists or by an outside dentist.  If the surgery were to be performed elsewhere, such as at the Reception and Medical center, Plaintiff would have to be transported 10 or more times, and security staff would be diverted from other security needs.  Removal of all of Plaintiff's teeth is unlikely to be quicker.  It is hard to imagine a dentist willing to remove 16 teeth from a patient in one sitting.  And even if pulling all 16 teeth could be properly be done in one sitting, removal of this many sound teeth is medically inappropriate.

Further, if Plaintiff were to have his gold crowns removed, other prisoners would perceive that Plaintiff had received preferential dental treatment, receiving a cosmetic procedure ahead of prisoners with serious dental needs, and inmate morale and security would be impaired.  This could lead to demands from other prisoners to obtain other kinds of cosmetic services at their own expense, such as orthodontics, teeth whitening, and  tattoo removal, or perhaps other cosmetic surgery related to religious beliefs, such as circumcision.  Defendant has shown that the Department has a compelling state interest to deny Plaintiff's request to have his gold crowns removed.

Defendant has also shown without dispute that denial of Plaintiff's request to have all of his gold crowns removed is the least restrictive means to secure this compelling government interest.  Either the crowns will be removed or they will not. There is no middle ground.  Defendant is entitled to summary judgment in its favor as to this claim.

**Plaintiff's motion for a preliminary injunction, doc. 329**

Plaintiff alleges and has shown by his affidavit that since 1999, he has had colitis and irritable bowel syndrome, and cannot consume fruit, vegetables, and beans.  Doc. 329, p. 2.   This is seriously in conflict with Plaintiff's Halal diet claim in his fourth amended complaint, where he sought a diet of raw vegetables, fruit, nuts.

Plaintiff further alleges he was prescribed a therapeutic diet to accommodate his colitis and irritable bowel syndrome.  *Id*.  He alleges that prior to April 30, 2009, he was also permitted to select a non-meat alternate entree to add to his therapeutic diet, but after that date, he has not been allowed to select the non-meat substitute entree.  *Id.*, p. 3.  He alleges that on April 30, 2009, Dr. Malaver at Florida State Prison prescribed a

"low residue diet" for his irritable bowel disease, but that diet must be renewed every 90 days.  *Id.*  He alleges that this therapeutic diet has meat, and only 5 out of 21 meals do not include a meat entree.  *Id.*  He alleges that due to his religion, he must refuse 16 out of 21 therapeutic diets with meat.  *Id.*, p. 4.  He seeks a preliminary injunction so that he can continue to receive a non-meat entree with his therapeutic diet.

In part this motion is premised upon entitlement to a Halal diet.  That RLUIPA and First Amendment religion claim fails for the reasons set forth above.

Plaintiff has never before made a *medical* claim in this case arising under the Eighth Amendment, and Defendant McNeil is not the proper Defendant.  This case has been litigated for four years.  There is no good reason to further extend this case by allowing Plaintiff to shift focus to an Eighth Amendment claim.  The motion for preliminary injunction should be denied.

Accordingly, it is **RECOMMENDED** that Plaintiff's motion for a preliminary injunction, doc. 329, be **DENIED**, Defendant's motion for summary judgment, doc. 312, incorporating the earlier motion for summary judgment, doc. 272, be **GRANTED**, and that the Clerk be **DIRECTED** to enter judgment in Defendant's favor.

**IN CHAMBERS** at Tallahassee, Florida, on July 6, 2009.


**s/    William C. Sherrill, Jr.**
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**


**NOTICE TO THE PARTIES**

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 10 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**